## KATZ v. NAST et al.

(Circuit Court of Appeals, Seventh Circuit. November 4, 1910. Rehearing Denied April 11, 1911.)

### No. 1,675.

1. BROKERS (§ 24*)—RELATION—BROKER'S OBLIGATION.

On the acceptance of a customer's order and the deposit of a margin for the purchase of stock, the broker undertakes to advance the purchase money required in excess of the margin and promptly obtain the stock ordered, to carry and hold such amount of stock in his hands or under his control as the property of, at the risk and for the sole use of the customer, ready for delivery on his order so long as the margins required by the broker are kept good, and to make delivery to the customer on payment of his advances, less any dividends paid on the stock, interest thereon, and commissions, or to sell the shares on the order of the customer, and to account to him for the proceeds in like manner.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 19; Dec. Dig. § 24.*]

---

2. BROKERS (§ 26\*)—BROKER AND CUSTOMER—RELATION OF PARTIES.

The relation between customer and broker on the purchase of stocks on margin when the purchase is made is that of pledgor and pledgee, and not that of debtor and creditor, so that, while the customer's property right in the stock purchased must be preserved, the certificates, being treated as only the evidence of property in the shares, are interchangeable in the hands of the broker so long as an equivalent amount of shares are kept under his control to meet the requirements of the contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 20; Dec. Dig. § 26.\*]

3. BROKERS (§ 24\*)—PURCHASE OF SHARES ON MARGIN—METHOD OF BUSINESS —CUSTOMER.

Where a broker purchases stock on a margin for a customer, he is not authorized either by the custom of brokers or by the methods of dealing on the exchange to immediately sell the stock so purchased without retaining a sufficient number of shares on hand to deliver to the customer on demand and payment of the price, and thus to convert the transaction into a mere item of debit and credit between the broker and customer with no feature of present ownership of the stock.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 24.\*]

4. BROKERS (§ 30\*)—CONTRACT—PERFORMANCE.

Where brokers, after purchasing stock for a customer on margin, immediately sold the same for their own benefit during the pendency of the transaction, and did not keep on hand a sufficient number of shares of the stock purchased to fulfill the contract in case delivery was demanded, and thereafter claimed to have closed the account by the sale of the stocks for the customer's default in failing to supply the required margins, the brokers were not entitled to recover losses sustained because of a failure to show performance on their part.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 30.\*]

In Error to the Circuit Court of the United States for the Northern District of Illinois, Eastern Division.

Action by Alex D. Nast and another, doing business as A. D. Nast & Co., against Herman Katz. Judgment for plaintiffs, and defendant brings error. Reversed.

The plaintiff in error, Herman Katz, was defendant below in a suit instituted by the defendants in error (copartners under the name of A. D. Nast & Co.) to recover an alleged indebtedness, with issues framed under the common counts. Suit was commenced in the municipal court of Chicago and removed to the Circuit Court of the United States, on petition of the defendant, where the cause was submitted to the court for trial, upon written stipulation waiving a jury. Findings of fact were filed, with conclusions of law against the defendant below for recovery of $4,489.79 and reversal of the judgment entered accordingly is sought under this writ of error.

Errors are assigned, in substance, that such recovery was unauthorized, (1) under the facts as found by the court, or (2) under the undisputed facts in evidence, and (3) that the defendant was and is entitled to judgment in his favor, under his several motions therefor. The facts, as found by the trial court, were in substance:

(1) That the plaintiffs are and were citizens of Illinois and copartners engaged in the business of stockbrokers at Chicago; and the defendant is and was a citizen of Wisconsin, engaged in business as a merchant at Milwaukee.

(2) That the defendant employed the plaintiffs as brokers to buy and carry for him shares of stock hereinafter specified, upon margins furnished by the defendant, for disposition as directed by him.

(3) "That pursuant to such employment, and on the 4th day of December, 1906, the defendant ordered the plaintiffs as brokers to purchase for him 200 shares of the par value of $100 each of the capital stock of the North American Company, a corporation, and that, pursuant to such order, the plaintiffs placed the order for such purchase with their New York correspondents Laidlaw & Co., a firm of stockbrokers doing business upon the New York Stock Exchange, who thereupon and on said 4th day of December, 1906, purchased on the floor of said Exchange 200 shares of said stock at the price of $91⅝ per share, such purchase being made in the manner hereinafter set out. That pursuant to such employment on the 1st day of February, 1907, the defendant ordered the plaintiffs as such brokers to purchase for him 500 shares of the par value of $100 each of the capital stock of the Atchison, Topeka & Santa Fé Railroad Company, a corporation, and that the said plaintiffs placed the order for such purchase with their said correspondents Laidlaw & Co., who upon that day purchased 500 shares of said stock on the floor of the New York Stock Exchange at the price of $100.25 per share, such purchase being made in the manner hereinafter set out."

(4) "That on the 9th day of April, 1907, the defendant ordered the plaintiffs as brokers to sell 100 shares of the said stock of the Atchison, Topeka & Santa Fé Company, so ordered to be purchased by him as aforesaid, and that on said day the said plaintiffs as brokers transmitted an order to sell 100 shares of the stock of said company to their correspondents Sternberger, Sinn & Co., of New York, by whom 100 shares of such stock was sold on that day on the floor of the New York Stock Exchange at the sum of $97.50 per share in the manner hereinafter mentioned." .

(5) "That in the month of May, 1907, the defendant left the United States for an extended visit to Europe, and did not return until the month of December, 1907. That prior to his said departure defendant had an interview with the plaintiffs in which he notified them of his intended visit and of the fact that he would be absent as aforesaid. That at the time of his said interview defendant had on deposit with the plaintiffs as margins for the stock so ordered to be purchased by him as aforesaid the sum of $7,500. That on or about the 1st day of October, 1907, the prices of the stock so ordered to be purchased by the said defendant had fallen, so that the said sum of $7,500 so left by him with the said plaintiffs as margins was exhausted, but that between the 1st and 12th days of October, 1907, the stock so ordered to be purchased by defendant could have been sold without other loss than the said amount so deposited as margins. That, commencing with the 12th day of October, the market price of such stocks began to fall rapidly, and on the 16th day of October the plaintiffs cabled the defendant in Europe to forward the sum of $5,000 as additional margins for such stock. That on the 18th of October the defendant replied, 'Impossible to send money. Carry account if you are willing,' and thereupon the plaintiffs without notice to defendant through their correspondents, Laidlaw & Co., sold 400 shares of the capital stock of the said Atchison, Topeka & Santa Fé Railroad Company at prices ranging from $79 to $79⅜ per share; and on the 22d day of October, through their said correspondents, Laidlaw & Co., sold 200 shares of the capital stock of the said North American Company at $50 per share, and credited the account of the said defendant with the proceeds of such sales, such sales being made in the manner hereinafter mentioned."

(6) "That the plaintiffs kept an account with the said defendant upon their books and debited said defendant upon said account with the full purchase price of the stock so ordered to be purchased when and as purchased as aforesaid, and credited defendant on said account with the amounts paid by him as margins and with certain dividends declared upon said stock, and with the amounts received on the said sales of stock, and at the end of each month charged defendant on said account the interest on the difference between the amounts on the debit and credit side of said account. That the balance due to the plaintiffs as shown by said account after said stocks were sold, and on the 22d day of October, 1907, was the sum of $3,754.66."

(7) "That during all said times the said plaintiffs had a large number of customers for whom they acted in purchasing and selling stocks upon

margins and absolutely on the New York Stock Exchange through their said correspondents Laidlaw & Co. and Sternberger, Sinn & Co., and that said plaintiffs, through their said correspondents, purchased and sold for their various customers a large amount of stocks daily. That the method in which such business was transacted was as follows: Plaintiffs, on receiving an order from a customer to purchase or sell a certain stock, transmitted such order by special wire to one of said New York firms, its correspondents. On its receipt, such order was telephoned by the telegraph operator in the main office of such firm to the firm's telephone operator at the Exchange, who thereupon communicated it to the employé of the firm employed on the floor of the Exchange in executing its orders. That such orders were executed on the floor of the Exchange by such employé by entering into an agreement on behalf of his employer for such sale or purchase with some other member of said Exchange. All agreements for the purchase and sale of stock made on the floor of the Exchange are consummated on the following day except that such agreements made on Friday are consummated on the following Monday. All such agreements which relate to stocks listed on said Stock Exchange, and known as clearing house stocks, are consummated through the clearing house of the Exchange in the following manner: Each member of the Exchange makes daily report to the clearing house of the various agreements for the purchase and sale of stocks made by him, giving the names of the vendor and vendee, the name of the stock dealt in, and the price, and thereupon delivers to or receives from the clearing house certificates of each of the various stocks covered by such transaction, equal to the difference between the amounts of each such stock so bought and sold by him, and pays to or receives from the clearing house in cash the difference in price."

(8) "That the stock of the said Atchison, Topeka & Santa Fé Railroad Company is a clearing house stock. That the total number of shares of said stock received by Laidlaw & Co. in settlement of their purchases and sales thereof made on February 1, 1907, was 300, and no more, being the difference between the number of shares of said stock agreed to be bought and sold, respectively, by said firm on said day. That on October 18, 1907, the number of shares of said last-named stock agreed that day to be bought by said firm exceeded by 400 shares those then agreed to be sold by it, and it delivered no certificates of such stock but received certificates for 400 shares thereof on the settlement of its business for that day. That on the 9th day of April, 1907, the said Sternberger, Sinn & Co., pursuant to the order so given to them by the plaintiffs, agreed to sell 100 shares of the stock of the said Atchison, Topeka & Santa Fé Railroad Company, at the price hereinbefore mentioned, and on the same day agreed to buy 100 shares of said stock, and that, when such transactions were consummated through the clearing house, no shares of such stock were delivered or received by said Sternberger, Sinn & Co., but they paid to the said clearing house the difference in the price of such stock; that the only evidence of the actual receipt or delivery of any certificates of stock of said Atchison, Topeka & Santa Fé Railroad Company are the entries to that effect upon the books of the said Laidlaw & Co. and Sternberger, Sinn & Co."

(9) "That the stock of the North American Company is what is known as a nonclearing house stock, and that settlements of transactions had therein by members of said New York Stock Exchange are not made through the clearing house, but by delivery of certificates of such stock direct to the purchaser. That on the 5th day of December, 1906, certificates for 200 shares of said last-named stock were delivered by the vendor to said Laidlaw & Co. on the purchase made by said firm pursuant to an order of plaintiffs hereinbefore mentioned, and were paid for by said Laidlaw & Co. and charged to plaintiffs' account. That the stock represented by such certificates was not kept and retained by said Laidlaw & Co., but was sold and disposed of by them long prior to October 22, 1907. That the sale of 200 shares of said last-named stock by said Laidlaw & Co. on said last-named day, pursuant to the order of the plaintiffs hereinbefore mentioned, was consummated by receipt of the purchase price which was placed to the credit of plaintiffs' account and the delivery of other and separate certificates of stock of said North

American Company in nowise connected with or related to the certificates
delivered on said 5th day of December, 1906."

(10) "That the accounts and entries of purchases and sales of stock made
by each of the said New York firm correspondents of the plaintiffs upon the
order of the latter were made by the former on their books in the name of
Nast & Co. That the names of the customers of the plaintiffs for whom such
stock was purchased or sold did not appear on the books of, nor were the
same known to, the New York firm. That from time to time accounts were
rendered by the said New York firms to the plaintiffs and payments in cash
made from time to time on account by the plaintiff to the New York firms, or
vice versa."

(11) "That at various times between the 1st day of February, 1907, and the
18th day of October, 1907, the plaintiffs forwarded orders given by their cus-
tomers to Laidlaw & Co., and the latter bought and sold on the New York
Stock Exchange in the manner hereinbefore mentioned for the account of
plaintiffs nearly 30,000 shares of the capital stock of the said Atchison, To-
peka & Santa Fé Railroad Company. That the amount of certificates of stock
of that company in the hands of said Laidlaw & Co. was constantly shifting.
That there is no evidence expressly or affirmatively to show that plaintiffs,
or their correspondent, Laidlaw & Co., or either had on hand, or under their
or either of their control, between the 4th day of December, 1906, and the 22d
day of October, 1907, certificates of stock of the North American Company
which they could have delivered to defendant on demand equal to the amount
of such stock ordered to be purchased by him as aforesaid. That there is no
evidence expressly or affirmatively showing that between the 1st day of Feb-
ruary, 1907, and the 18th day of October, 1907, the said plaintiffs or the said
Laidlaw & Co., or either, had on hand certificates of stock of the said Atchi-
son, Topeka & Santa Fé Railroad Company which they could deliver to the
defendant on demand equal to the amount of such stock ordered by him to
be purchased as aforesaid. That, on the contrary, the said Laidlaw & Co.
were chargeable with the delivery to the said plaintiffs at any time within
said period above mentioned with merely the difference between the amount
of stock of the said Atchison, Topeka & Santa Fé Railroad Company ordered
to be bought and sold through said Laidlaw & Co. by plaintiffs for the account
of the various customers of the latter."

(12) "That there is no evidence expressly or affirmatively showing that at
all times or at any time between the 4th day of December, 1906, and the 18th
day of October, 1907, the said plaintiffs or the said Laidlaw & Co., or either,
had on hand, or under their or either of their control, ready for delivery to
defendant, the stock of the North American Company so, as aforesaid, or-
dered by him to be purchased, or an equal amount of other shares of the
same stock, and that there is no evidence expressly or affirmatively showing
that at all times or at any time between the 1st day of February, 1907, and
the 18th day of October, 1907, the said plaintiffs, or the said Laidlaw & Co.,
or either, had on hand or under their or either of their control, ready for
delivery to defendant, the stock of the said Atchison, Topeka & Santa Fé
Railroad Company so as aforesaid ordered to be purchased by defendant, or
an equal amount of other shares of the same stock."

Frank M. Hoyt, John J. Herrick, Charles L. Allen, and Horace H.
Martin, for plaintiff in error.

Jacob Ringer, for defendants in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). This
suit arises out of transactions between the parties, in the well-recog-
nized relation of broker and purchasing customer, for obtaining shares
of stock as ordered, on margins furnished by the customer, to be held
by the broker for the customer's use and benefit; and the only ques-
tion presented for review is whether performance on the part of the

broker is established by the facts preserved of record. The brokers, A. D. Nast & Co., sued as plaintiffs to recover of Katz (plaintiff in error) as defendant-purchaser therein for alleged default in the contract, and the issues were tried before the court (upon stipulated waiver of a jury), resulting in findings of specific facts, upon which such recovery was awarded; and the ultimate facts so found, whereon the judgment must rest, are these in substance: (1) The shares of stock in controversy were ordered by the defendant, as alleged, with a satisfactory deposit of funds for margin, to be purchased by the brokers for the defendant's ownership and use. (2) Such shares were promptly purchased by the plaintiffs on the New York Stock Exchange, through their New York brokers, in the customary methods of the Exchange. (3) The large order thus filled, was for 500 shares of so-called "Atchison stock," classified on the Exchange as "Clearing House stock," and the purchase was made in the course of various purchases and sales of such stock by the broker during the day, whereof adjustment was made, in conformity with the well-recognized custom of the Exchange, by setting off one deal against another and making delivery of and payment for balances of shares thus reached in the transactions of the day, resulting in an actual delivery of only 300 shares of such stock; and that the only evidence preserved of the purchase was "entries to that effect upon the books" of the brokers. (4) The other order in suit was for 200 shares of North American Company stock, known as "nonclearing house stock," which was purchased and received by the New York broker "and charged to plaintiff's account," but "the stock represented by such certificates was not kept and retained" and "was sold and disposed of long prior" to the alleged sale closing out the defendant's purchase, as hereinafter mentioned. (5) Several months after the defendant's orders were placed (and while he was absent from home in Europe) the market price of both stocks had fallen, so that the depreciation had exhausted his deposit for margin, and the plaintiffs cabled him to forward $5,000 additional margin, which he failed to remit. (6) Thereupon the plaintiffs caused sale to be made (on the New York Exchange) of an equivalent number of shares, and their depreciation amounted to a net loss of $3,754.66 upon the defendant's orders, in excess of his margin credit.

The findings included, as well, extended recitals of the methods of dealing in stocks on the Exchange and of the business therein conducted by these brokers, including large purchases and sales of "Atchison stock" for other customers during the pendency of the defendant's contract, whereby the amount of such shares on hand "was constantly shifting," together with statements that "there is no evidence expressly or affirmatively to show" that either of the class of shares purchased for the defendant was on hand or under control of the brokers, so that "they could have delivered to defendant on demand" an amount thereof equal to his orders. In reference to the purchases of stock upon the Exchange, it is neither questioned nor questionable that each was a valid contract of bargain and sale between the brokers engaged therein; and the customer is not concerned with the method of settlement for purchase money thus adopted, so long as his order is

filled, nor are the circumstances stated deemed material, except as they show the amount of shares actually delivered to the broker on each occasion. Nor is it questionable that the defendant was in default under his contract through his failure to remit the additional margin required, and thus liable for the loss above stated, provided the purchase of stock so made completed performance of the undertaking on the part of the plaintiffs up to such alleged default. For solution of the issue of law, therefore, the nature of the contract in suit and obligations assumed by the plaintiffs must be ascertained.

Whatever may appear to be the difficulty in its interpretation, due not only to the various relations arising between the broker and customer in carrying out the contract, but to inharmonious decisions thereupon in various jurisdictions, we believe the rule recently applied in Richardson v. Shaw, 209 U. S. 365, 371, 374, 28 Sup. Ct. 512, 52 L. Ed. 835, to be applicable to the case at bar, and that the doctrine of that case—approving in terms the interpretation of like contracts adopted in the earlier leading cases of Markham v. Jaudon, 41 N. Y. 235, 239, and Skiff v. Stoddard, 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102—must govern this court in settlement of the inquiry.

[1] The obligation on the part of the broker and his relation therein to the customer are thus established, substantially as follows: That, upon acceptance of the customer's order and deposit of margin for a purchase of stock, the broker undertakes (a) to advance the purchase money required in excess of the margin and promptly obtain the stock so ordered; (b) to carry and hold such amount of stock, in his hands or under his control, as the property, at the risk and for the sole use of the customer, ready for delivery upon his order, so long as the margins required by the broker are kept good; and (c) to make delivery thereof to the customer on payment of his advances (less any dividends paid on the stock), interest thereon, and commissions accruing to the broker; or (d) to sell the shares upon order of the customer and account to him in like manner for the proceeds.

[2] The relation thus fixed between the parties, when the purchase is made, is that of pledgor and pledgee in reference to the stock, and not that of debtor and creditor in such transaction; and, while the property right of the customers must be preserved, the certificates— as "not the property itself, but the evidence of property in the shares" —may be treated as interchangeable in the hands of the broker, so that an equivalent amount of shares under his control meets the requirements of the contract. See, also, Rothschild v. Allen, 90 App. Div. 233, 86 N. Y. Supp. 42, affirmed 180 N. Y. 561, 73 N. E. 1132.

Although the above-stated general doctrine in reference to the contract is not directly controverted on behalf of the plaintiffs (defendants in error), we believe both contentions of counsel in support of the judgment to be inconsistent therewith. These propositions are, in effect: First, that neither the rule referred to nor the contract in suit, in view of the well-known methods of dealing on the Stock Exchange, intends or requires an equivalent amount of shares to be actually carried, either in the hands of the broker or directly under his

control, for delivery to the customer's order, and that the sole obligation incurred by the broker (after purchase) was to "be prepared to deliver the amount to his customer whenever he should call and pay the cost"; or, second, that actual holding of the stock, if needful, presumptively appears from the express finding of purchase, and neither the above-mentioned recitals therein as to the evidence and want of evidence on that question nor the testimony preserved in the record can disturb the judgment.

[3] 1. The interpretation sought under the first contention would deprive the contract, as we believe, of its essential characteristic, as an actual purchase of the stock by the customer with the so-called margin serving for purchase money, and thus leave the transaction as a mere item of debit and credit between broker and customer, with no feature of present ownership of the stock. If not, in such view, a contract of wager over the rise or fall of market values—of credit to the customer's account for higher rates and debit for losses—it cannot be doubted that no ground would exist thereunder for either of the distinctions above stated, creating the relation between the parties of pledgor and pledgee, and not that of debtor and creditor. Purchase by and continuous ownership in the customer require possession, actual or constructive, of certificates for the shares, the only recognized muniment of legal title to stock; and we believe the contract in suit must be so defined, requiring the brokers to have and retain the amount of shares purchased for the customer, within their possession or control during the pendency of the contract, to meet their undertaking. Neither personal obligation and ability on the part of the brokers to purchase shares in the market when called upon, nor credit to that end upon their books in favor of the customer, constitutes performance of such contract. When the customer becomes owner of the stock, his property right, in the absence of default on his part, cannot rightfully be disposed of by the broker, and stands unaffected by solvency or insolvency of such broker holding the stock; and this, as before stated, notwithstanding the rulings (a) that the broker is free (owing to the nature of the shares) to dispose of any stock held by him, so long as he retains a sufficient amount thereof for delivery to the pledgor, and (b) that stock held for his pledgor may be repledged by the broker, for his personal benefit, to the extent of his interest therein. Richardson v. Shaw, supra.

In reference to the rule cited by counsel as to bank funds—that the banker is not required to keep on hand the aggregate amount of bank deposits subject to check—the relation between banker and depositor is well settled as that of debtor and creditor in such deposit, so that the illustration is deemed without force in the case at bar. We are of opinion, therefore, that no definition of the contract is authorized to relieve the plaintiffs from entire performance in conformity with the foregoing rule, and that, however technical the requirement may appear to be in the case of shares readily obtainable in the open market, the judgment is unsupported without facts tending to prove both purchase and holding of stock for delivery under the contract.

[4] 2. The remaining contention, as to the effect of the findings of fact, is untenable in its postulate that any presumption of delivery

and holding, which might otherwise arise from the finding of purchase of the stock, is not overcome by other facts found by the trial court. It is expressly stated, as findings of ultimate fact, that only 300 shares of Atchison stock were received by the brokers (out of 500 ordered by the defendant), and that the 200 shares of North American stock purchased for the defendant "was not kept and retained" by the brokers, but "was sold and disposed of by them long prior" to alleged default upon the part of the defendant. Under facts thus found (appearing in the testimony on behalf of the plaintiffs), no basis is furnished for the assumed inference of fact from the purchase, of continuous possession of the stock, even by way of prima facie proof upon such issues raised by the pleadings.

Moreover, these findings are special, not general, and must be read as an entirety for any needful deductions of fact not stated in terms. Although wanting in precise statement of ultimate fact—containing summaries of the testimony and statement of matters as not "expressly or affirmatively shown"—we believe the findings to be conclusive of these ultimate facts: That the brokers neither received nor held any shares of stock, in their hands or under their control, as the property of the customer, in either purchase made by them, as found; that each of such formal purchases of stock, however consummated, was entered into on the part of the brokers, without either vesting title to the shares in the customer, or intention to that end; and that the sole purpose and effect of their transaction throughout was to create the relation of creditor and debtor between broker and customer, with reciprocal accountability for like amount of shares or their value. In other words, the transaction on the part of the brokers made the purchase their own, not that of the customer, and was in contravention of their contract in suit, as well pointed out in Richardson v. Shaw, supra, 209 U. S. 379, 28 Sup. Ct. 512, 52 L. Ed. 835, in approval of the quotation from Skiff v. Stoddard, supra.

Whatever may be the difficulty imposed upon the broker in performance of his undertaking as above defined, and whatever the practice among brokers in respect thereof, we are of opinion that no other interpretation of the contract in suit is authorized, and that for want of performance thereof on the part of the plaintiffs below, the judgment in their favor is erroneous.

The judgment of the Circuit Court, therefore, is reversed, and the cause remanded, with direction to enter judgment upon the findings in favor of the plaintiff in error, as defendant below.