Booth, Judge,
delivered the opinion of the court:
The importance of this case is magnified by the number dependent upon its decision, for it is manifestly one of a large class. The facts are not disputed, a stipulation covering practically all the essential ones being in the record.'
The plaintiffs are copartners engaged in the brokerage business in New York City under the firm name of Provost Brothers and Company. Through proper connections with the New York Stock Exchange they accept and execute orders from customers for the sale of stock short, or, as-familiarly known, short sales of stock. The stipulated facts disclose the following steps involved in a short sale of stock: X, the customer, gives to Y, his broker, an order to sell 100 shares of a certain stock which neither X nor Y owns or possesses, and which, of course, X can not deliver to Y. At the time the sale is made Y accepts the order and sells 100 shares of the designated stock to S.
The rules of the stock exchange require the delivery to the purchaser of all stock purchased on the day following the purchase. Therefore, in order to comply therewith and make delivery, Y procures the 100 shares from M, another broker, and delivers the same to S, at the same time being required by M to deposit with him a sum of money equal to-the market value of the stock so procured and maintain said deposit on a par with the market value of the same from day to day so long as the transaction continues. If the stock advances, Y must increase the deposit; if it declines, M is *58 required to pay the amount of the same to T. At all events the amount of the deposit in accord with the market value of the stock must be maintained. M may demand of Y a return of an equal amount of stock at any time he chooses, and Y is obligated to so return it. M, if the agreement so provides, may be required to pay interest on the deposited funds at a rate agreed upon. M may, if he chooses, decline to pay any interest whatsoever and instead exact a premium for the loan of the stock. The question of loaning and the terms of the loan rest with M. Finally X, the customer of Y, desires to close the short sale, i. e., “ cover his short sale.” Y then goes into the open market arid purchases 100 shares of stock of the same kind he procured from M, delivers it to M, and reclaims his deposit, settling afterwards with his customer. The transaction is obviously speculative, and in so far as its consummation is concerned the customer X is not a party to the agreement between Y and M.
In the course of business and in accord with the rules and customs of the exchange, the transfer of shares of stock from what is known as the lending broker to the borrowing broker is accomplished by the exchange of “loan tickets” and “ borrowed stock returned tickets,” these being no more than written memoranda of the transaction. Actual delivery is accomplished by the balanced transactions of the brokers through the Stock Exchange Clearing House each day. The Commissioner of Internal Eevenue, in construing the Eevenue Acts of 1917 and 1918, after repeated conferences, followed by an opinion of the Attorney General, ruled in Treasury Decision No. 2685 that the plaintiffs, as well as all others similarly engaged, must affix to the memoranda, i. e., the tickets, and cancel revenue stamps of the requisite amount in every instance of lending and the return of borrowed stock to effectuate a short sale thereof. This the plaintiffs did to the amount of $8,344.76, and this is the sum involved in this proceeding, the parties stipulating that the total represents the amount expended for revenue stamps, some of which were affixed to the loan-stock tickets and the balance to borrowed stock-return tickets.
*59 It is conceded that under the revenue laws' stamps are required to be affixed and canceled in sales of stock short when the borrowed stock is delivered by the borrowing broker to the purchaser S, and likewise when the stock is purchased by the borrowing broker to be returned to the lending broker M. No question as to transfer of title is raised as to these two transactions. The challenge of illegality goes exclusively to the intermediate steps employed by the borrowing broker to procure the stock in order to fulfill his sale thereof and to the instances where stock is loaned for a similar purpose. As to this transaction between Y and M, and to which X, the customer of Y, is not a party, the plaintiffs contend that from its very nature the legal relationship of pledgor and pledgee exists, and a fortiori title to the stock was not transferred, but remained in the lender of the stock, and its mere physical delivery to the borrower of the stock was not such a delivery of the same as the revenue laws contemplate.
So far as this discussion is affected, the pertinent provisions of the revenue acts of 1917 and 1918 are the same. Paragraph 4 of Schedule A, Title VIII of the revenue act of 1917, 40 Stat. 300, 319, 322, provides as follows:
“ schedule A.-STAMP TAXES
$$$$$$$
“ 4. Capital stock, sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to shares or certificates of stock in any association, company, or corporation, whether made upon or shown by the books of the association, company, or corporation, or by any assignment in blank or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale, whether entitling the holder in any manner to the benefit of such stock or not, on each $100 of face value or fraction thereof, 2 cents, and where such shares of stock are without par value, the tax shall be 2 cents on the transfer or sale or agreement to sell on each share, unless the actual value thereof is in excess of $100 per share, in which case the tax shall be 2 cents on each $100 of actual value or fraction thereof: Provided, That it is not intended by this title to impose a tax upon an agreement evidencing a deposit of stock certificates as *60 collateral se'curity for money loaned thereon, which stock certificates are not actually sold, nor upon such stock certificates so deposited: Provided fwrther, That the tax shall not be imposed upon deliveries or transfers to a broker for sale, nor upon deliveries or transfers by a broker to a customer for whom and upon whose order he has purchased same, but such deliveries or transfers shall be accompanied by a certificate setting forth the facts: Provided further, That in case of sale where the evidence of transfer is shown only by the books of the company the stamp shall be placed upon such books; and where the change of ownership is by transfer of the certificate the stamp shall be placed upon the certificate; and in cases of an agreement to sell or where the transfer is by delivery of the certificate assigned in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale, to which the stamp shall be affixed; and every bill or memorandum of sale or agreement to sell before mentioned shall show the date ther'eof, the name of the seller, the amount of the sale, and the matter or thing to which it refers. Any person or persons liable to pay the tax as herein provided, or anyone who acts in the matter as agent or broker for such person or persons who shall make any such sale, or who shall in pursuance of any such sale deliver any stock or evidence of the sale of any stock or bill or memorandum thereof, as herein required, without having the proper stamps affixed thereto with intent to evade the foregoing provisions shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not exceeding $1,000, or be imprisoned not more than six months, or both, at the discretion of the court.”
The enacting clause of the statute is free from ambiguity. Its terms are specific. The manifest legislative intent was to subject the ordinary and usual dealings in stock to the payment of the stamp tax imposed, except as to the transactions enumerated in the provisos. The lañguage employed obviously extends, and was designed to extend, to “sales, or agreements to sell, or memoranda of sales or deliveries of or transfers of legal title to shares or certificates of stock.” These words, when given their usual and customary meaning in the commercial world, are in nowise obscure, and it would be difficult indeed to have employed language conveying a plainer intent to reach the modus operandi of dealings in stock, both on and off the stock exchange, than appears from a reading of the statute. If, *61 then, the plaintiffs’ claimed immunity from the payment of the tax is to prevail, it must appear that the steps involved in the procurement and return of the borrowed stock do not constitute in law a transfer of the title to the same “ or deliveries of ” the stock, for in all other respects the details of the transactions seem to come within the law. Selling short, as previously observed, is entirely a speculative transaction. One who sells short through a broker hazards a bargain on the decline of the market value of the stock sold. The customer knows, and of course the broker is fully conscious, of the necessity of procuring the stock to make delivery thereof. While the customer is not a party to the procurement of the stock, he knows, and it is notorious that one of the express duties of the broker is to procure the stock for this very purpose.
Selling short has long been an established custom of stock exchanges. The mode of meeting the requirements of the law with respect thereto has been in existence for many decades. It is an established trade, indulged in daily to a large extent, and it is indisputable that the intent and purpose, the vital and moving motive, for the transfer of stock from the lending to the borrowing broker, and vice versa, is to enable the one borrowing the stock to complete a sale of the identical stock borrowed by transferring the title of the stock borrowed to the purchaser. This is the very essence of the transaction. Bereft of this right and privilege to pass title to the stock borrowed the transaction itself would lapse into discontinuance. The parties to it so understand, and have for a long time, and in innumerable transactions put this construction on the created relationship. To effectuate this purpose and simplify the proceedings certificates of stock are indorsed in blank and thereby made negotiable. No lender of stock has ever questioned or even contemplated challenging the right and privilege of the borrowing broker to transfer to his purchaser the complete title and possession of the borrowed stock. This right is part of the consideration for the inter partes agreement contemplated by the parties themselves and indisputably established by the rules and regulations of the exchange, and carried into effect by trading arrangements and regularly established posts on the *62 floor of the exchange where the lending and borrowing of stock to complete short sales is a firmly established stock transaction. It is true the borrower must return to the lender a like amount of stock, and enters into cash security to do that very thing, but the very fact that the borrower’s obligation is limited to a return of a like amount of stock when called upon to do so is potent evidence of the intention of the parties to vest title in the tangible stock transferred and grant to the borrower the legal right to procure as best he may the necessary stock to take the place of the amount first transferred to him. As said by the Attorney General, 31 Op. Atty. Gen. 255, 258, “ Shares of stock are fungible things, and their loan with an agreement to return things of the same class is the mutuum of Eoman law, as to which no one can doubt that title passed from the lender to the borrower and vice versa.”
In addition to what has been said, the revenue acts of 1917 and 1918 apply specifically to the title of the tangible thing transferred. Stamps must be affixed to the memoranda, to the agreement or to the certificate when any one of these instruments passes from one to another in ownership, irrespective of the agreement between the parties as to reciprocal rights and obligations growing out of the transaction. It is a tax upon the instrument itself, and it may not for a moment be doubted that the transfer of the certificate of stock from the lending to the borrowing broker vests in the latter by the very terms of the agreement complete legal title to the certificate, a title sufficient in law to enable him to convey it to another free from all claims and demands whatsoever of the lender, and which the lender voluntarily parts with and never receives in return. The agreement of the borrower to maintain the status quo of the lender as the real owner of the stock and pay to him accrued dividends thereon is manifestly an obligation assumed for the transfer of the stock to the borrower. The latter does not, nor does he pretend to collect dividends from the corporation issuing the stock; he necessarily pays them from his private funds. Likewise, the lender assumes in the agreement the liabilities of an owner of stock and agrees to pay all assessments, etc.; but as between the corporation issuing the stock and the *63 lender, no liability attaches to the latter. These assumed obligations are contractual. The title to the stock itself, or the certificate evidencing ownership thereof, has passed from both the parties to this contract and is vested in the purchaser. He, in reference to the ownership of the stock, collects the dividends from the corporation and is subject to the liabilities of a stockholder of the corporation. This, it seems to us, is clearly what the Congress regarded as a legitimate source of revenue and by the terms of the statute exacted the stamp tax whenever the title to the instrument passed from the owner to another.
When one purchases stock through a broker on a margin the Supreme Court has said that the legal relationship between the broker and his customer is that of pledgor and pledgee. Richardson v. Shaw, 209 U. S. 365; Gorman v. Littlefield, 229 U. S. 19. The plaintiffs stress this fact, and seek to liken a sale of stock short with a purchase of stock on a margin. In both the above cases no revenue legislation was involved. The controversy was between a trustee in bankruptcy of the broker’s estate and the purchaser of the stock on a margin from the bankrupt broker previous to his bankruptcy, and as the Attorney General in his opinion said, “ as against the broker and his trustee in bankruptcy an equitable right in rem to stock in the broker’s possession of the same species as that dealt in between them” prevailed. In delivering the opinion of the court in Richardson v. Shaw, supra, at p. 375, Mr. Justice Day said:
“ The position of the broker is twofold. Upon the order of the customer he purchases shares of stock desired by him. This is a clear act of agency. To complete the purchase he advances from his own funds, for the benefit of the purchaser, ninety per cent of the purchase money. Quite as clearly he does not in this act as an agent, but assumes a new position. He also holds or carries the stock for the benefit of the purchaser until a sale is made by the order of the purchaser or upon his own action. In thus holding or carrying he stands also upon a different ground from that of a broker or agent whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of the broker as such. In doing so he enters upon a new duty, obtains other rights, and is subject to additional responsibilities. In my judgment the *64 contract between the parties to this action was in spirit and effect, if not technically and in form, a contract of pledge.”
In other words, carrying a customer on a margin is the equivalent of loaning money upon stock as collateral for a loan. This, it seems to us, is essentially different from executing for another the* sale of stock which one does not own or possess. In one instance the broker purchases for another certain shares of stock for his customer advancing from his own funds eighty or ninety per cent of the purchase price, retaining possession of the stock, and exercising certain conferred rights with respect thereto until it is paid for and the deal closed. In the case of selling short the broker undertakes to complete the sale for his customer, and, unlike the margin transaction, he is not required from his own funds to maintain the deposit required by the lender to its full extent, for he receives as a credit toward this amount the purchase money which the purchaser of the stock pays him¡ on delivery, and thus may or may not be required to invest his own funds in the transaction at all. In any event, under the terms of the agreement the broker may not even be required to part with any greater sum of his own funds than the difference between what he receives from his vendee and the market value of the borrowed stock. If the stock declines the broker obtains the use of so much of his customer’s money. If it advances he must post the difference in market value with the lending broker. This, it seems to us, is an essential difference in character, so far as the borrowing broker is concerned, between a long sale on a margin and a short sale of stock. The borrowing broker has no stock as collateral; he has the funds of his customer to buy the same, and these funds he uses to procure the stock from the lending broker, and to repurchase as the necessities of the case require. Stripped of its technical refinements and considered free from all extraneous surroundings the established business of loaning and borrowing stock for the fulfillment of short sales of stock is sui generis in character, and not to be assimilated with other well known and easily recognized commercial transactions bearing some analogy thereto. The transaction is to be considered in the light of what it really is, the contract to be *65 construed according to the real intention of the parties and effect given to that intention as reflected by the relationship created and the vital purpose to be accomplished.
The indispensable requirement of actual delivery of stock sold short by brokers creates a market for borrowed stock, a market so extensive as to develop a settled and exclusive business for this identical purpose, a business conducted for profit and governed by the,rules of the stock exchange. A station on the floor of the exchange, as before observed, is set apart where dealings in borrowed stock obtain, and hours are fixed within'which the lender and borrower may appear and make terms as to the loan. The lender of stock con-cededly may exact a premium for its loan. .The lender of stock concededly may exact a premium for its loan, decline to pay interest on the deposited funds5 and otherwise adjust the terms of the transaction in accord with his own disposition in this respect, Transactions of this character are cleared through the Stock Exchange. Clearing House, and every feature of the transaction clearly and unmistakably indicates a mutual understanding and long settled conception of reciprocal rights accruing to the parties thereto. The lender knows that he passes to his borrower title to the stock transferred, for he knows the purpose of the borrowing is to complete a short sale thereof. ■ The borrower knows he acquires title to the stock and that he must eventually go into the open market and purchase from, another stock of like description to make good his agreement. Both parties to the agreement know that until this is done neither the lender nor the borrower has in his possession or ownership the stock passing from the one to the other. The tangible thing itself has passed in ownership and title from both, and this .in our opinion is what the revenue laws intended’ to tax. Whenever title-passed and transfer thereof was an. indispensable concomitant of the agreement- of the parties the stamps must be affixed to' the instrument representing the transfer, and canceled, irrespective of the contractual rights of the-parties to the-agreement voluntarily entered--into. The law taxed what actually happened, the instrument rep-' resenting change of ownership, and not- the contract of the *66 parties with respect thereto. Certificates of stock, like fungible goods circulating from one to another under the rules governing selling short, pass in ownership with the same effect and result as any other negotiable instrument.
We are alone concerned with the devolution of title of the specific thing itself. If by the terms of the agreement title to the subject matter passed, the law taxes its transfer, and the payment of the tax may not be escaped, notwithstanding the mutual obligations of the parties to the agreement by which title passed. In one instance rights are to be determined by the contract; with respect to the Government and the laws of Congress the transaction is to be viewed in the light of actualities and the principles of law applicable thereto. This we think is expressly accentuated by that provision of the taxing act which expressly inhibits the courts from consideration of beneficial interests so far as the holder of the stock is concerned. The tax, the statute says, must be paid on transfers of title “ whether entitling the holder in any manner to the benefit of such stock or not.”
The courts of New York, in two cases at least, have decided adversely to plaintiffs’ contention. Travis v. Ann Arbor Co., 168 N. Y. S. 53; Bonbright Co. v. State, 151 N. Y. S. 35. In both cases State revenue legislation, in every essential respect similar to the laws here involved, was considered by the court, and the issue was precisely as it is here.
Again, it is said that the case falls clearly within the first proviso to the statutes. The argument to sustain this proposition is addressed to an alleged similarity between the deposit of stock as collateral security for money loaned and the deposit of funds to secure the return of stock. To hold that the transaction covered by the findings comes within the meaning of the proviso would entail the necessity of doing violence to the ordinary and well-established meaning of its words. The depo.sit of stock as collateral for money loaned, a collateral loan, has a distinct and firmly established place in the commercial world. Bankers, business men and the entire commercial activity of the people have long since *fixed the significance of the term, and we have no doubt as to the intention of Congress in the enactment of the pro *67 viso. Unmistakably it refers to the procur- ment of a loan of money from a bank or those engaged in loaning money, where the borrower receives his funds and deposits at the time such stock certificates with the lender as will assure the repayment of the loan. Such a transaction is wholly foreign to the modus operandi of speculation in stocks and bears no relation to it. Short sales of stock are provided for by the rules of the exchange, the transaction its If ,is primarily a purchase and sale of stocks, and the very fact that Congress granted tax .immunity to collateral loans is itself a most convincing argument that all other transactions-in stocks were subject to the tax.
Finally, it is said that the proviso to the revenue act of 1921 clearly evinces an express intention to reject the construction put upon the acts of 1917 and 1918 by the Treasury Department. We assuredly recognize the rule, so emphatically asserted by the plaintiffs, that the court may examine all legislation in pari materia to ascertain legislative intent where the statutes are ambiguous and the meaning obscure. It i,s an ancient canon of statutory construction. In this particular instance, however, it is manifestly inapplicable, because it encounters a state of facts which precludes resort thereto. Subsequent to the rulings of the Treasury Department, and at a time when in keeping with said rulings the tax here objected to was being collected, an effort was made in Congress to have the proviso which finally passed in 1921 injected into the act of 1918, and Congress declined to do it. Therefore, Congress, with full knowledge of the Treasury Department’s construction and execution of the act of 1917, reenacted it without change in 1918. It was not until three years later that Congress changed the policy of its excise legislation and exempted short sales from the payment of the tax. If Congress, fully cognizant of what was being done, and fully aware of an insistence for a change from the adopted construction, not only declines to make the change but reenacts the statute under criticisrg, we need not cite authorities to sustain the proposition that the effect is manifestly a congressional adoption of the construction adhered to. See Hearings Before- Senate Finance Committee, on H. It. 12863, 65th Cong., 2d sess., p. 196; *68 Senate Report No. 617, 65th Cong., 2d se.ss.; House Report No. 767, 65th Cong'., 2d sess.
We have' not ignored the many questions raised in the very able and exhaustive briefs of counsel. To discuss them in detail would involve a tedious prolongation of this opinion. The defendant points out several technical objections to the maintenance of this shit. These, we think, are without mérit. In any event, we are convinced that the case is one which may be concluded on its merits.
The petition is dismissed. It is so ordered.
Graham, Judge; Hat, Judge; Do whet, Judge, and Campbell, Chief Justice, concur.