**ROBERTS et al. v. YEGEN et al.**

(Circuit Court of Appeals, Ninth Circuit.
April 30, 1926. Rehearing Denied
June 7, 1926.)

No. 4733.

1. **Bankruptcy ⚖=58—Substitution of collateral not a "preference," constituting act of bankruptcy.**

A transfer of notes to a creditor as collateral, in substitution for other collateral of equal or greater value, is not a "preference," constituting an act of bankruptcy.

[Ed. Note.—For other definitions, see Words and Phrases First and Second Series, Preference.]

2. **Bankruptcy ⚖=58—Payment of check by bank held not preferential; "preference."**

Payment by a bank, while a going concern of the check of a depositor, who had on deposit more than sufficient money to meet it, *held* not a "preference," constituting an act of bankruptcy.

3. **Bankruptcy ⚖=91(1)—Burden of proving solvency not cast on alleged bankrupt because of inability to produce books (Bankruptcy Act, § 3d, as amended by Act Feb. 5, 1903, § 2 [Comp. St. § 9587]).**

The provision of Bankruptcy Act, § 3d, as amended by Act Feb. 5, 1903, § 2 (Comp. St. § 9587), that the burden of proving solvency shall rest on an alleged bankrupt, if he fails to produce his books, papers, and accounts on the hearing of the issue, does not apply where there is good reason for his failure, as where they are in the custody of state receivers.

4. **Bankruptcy ⚖=91(2).**

Evidence considered, and *held* to sustain finding of District Court that insolvency of alleged bankrupts was not proved.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

In the matter of Christian Yegen and Peter Yegen, partners as Yegen Bros., Bankers, and individually, alleged bankrupts. Hilda Roberts and others, petitioners, appeal from a decree dismissing their petition. Affirmed.

Maury & Maury and Harlow Pease, all of Butte, Mont., for appellants.

Norris, Hurd & Rhoades and Geo. E. Hurd, all of Great Falls, Mont., for appellees.

Before HUNT, RUDKIN, and McCAMANT, Circuit Judges.

HUNT, Circuit Judge. In April, 1924, appellants, as petitioning creditors, sought adjudication as involuntary bankrupts of Christian Yegen and Peter Yegen, copartners as Yegen Bros., Bankers, and Christian Yegen and Peter Yegen as individuals. The District Court heard the matter and dismissed the petition. Petitioners appealed.

The case turns upon the following alleged acts of bankruptcy:

(1) That on February 9, 1924, with intent to hinder, delay, and defraud creditors, the firm and the members thereof transferred to the Anaconda National Bank 10,100 shares of Yegen Bros., Inc., of the reasonable value of $43,450, for a consideration of $20,000.

(2) That between February 15 and March 20, 1924, while indebted to the National Bank of the Republic of Chicago in the sum of $25,000 or more, and having pledged to that bank a note of Arnott & Sons for $35,000 and 850 shares of the Anaconda National Bank stock (total value of such securities $157,000), Yegen Bros. and Yegen Bros., Bankers, in payment of said debt, transferred to the Bank of the Republic the securities named, with intent on the part of the transferors and the transferee to hinder, delay, and defraud other creditors of the alleged bankrupts.

(3) That on February 9, 1924, while insolvent, the firm with intent to prefer, paid a debt of $20,000 to the treasurer of the city of Butte.

(4) That on February 4, 1924, while insolvent, Yegen Bros., the copartnership, owed $35,000 to the National Bank of the Republic of Chicago, and, with intent to prefer that bank, transferred to it securities and property worth $48,000, although the bank was already secured by 370 shares of the Gallatin Natural Gas Company stock and 850 shares of the Anaconda National Bank.

(5) That on February 4, 1924, with intent to delay and defraud certain persons, who owed the Butte bank money on promissory notes and had money on deposit in the Butte bank, the firm and the members thereof transferred to the Bank of the Republic of Chicago over $17,000 worth of such notes, thus depriving the makers thereof of their right to offset the bank deposits against such notes.

(6) That on February 11, 1924, while insolvent, the firm and the members thereof, knowing of their insolvency and with intent to prefer the National Park Bank of New York, paid that bank $50,000, although the debt to that bank was not greater than $56,000.

(7) That separate receiverships over banks of the respondents, appointed by state courts in Montana without provision for marshaling inter sese, must result in preference to partnership creditors, as more than five days elapsed after the receivers were put in

charge of the banks, and no steps to vacate the receiverships were taken by the respondents.

Answers resisting bankruptcy were filed by Yegen Bros., as partners and as individuals, and by Hanson, receiver of one of the banks. We will not state the testimony at length, but will summarize our views.

For many years Yegen Bros., the partnership and the individuals, engaged in banking, mercantile, and other businesses in Montana, and owned, among other property, the Yegen Bros. Bank at Billings, the Yegen Bros. Bank at Butte, and the Yegen Bros. Bank at Gardiner; eighty-five per cent. of the capital stock of the Anaconda National Bank, and interests in many incorporated and private enterprises in various parts of the state. About February 28, 1924, by direction of the Governor of the state, proceedings were instituted in certain of the state courts to secure the appointment of receivers to take charge of the banks at Butte, Billings, and Gardiner; those banks being alleged to be insolvent. Yegen Bros. failed to appear and answer; receivers were appointed for the several banks, and took possession of the books and papers of the respective banks at the places named.

The transaction of February 9, 1924, occurred about a week before the Yegen Bros. Butte bank closed its doors. The Butte bank, among its assets, held a certificate of stock for 10,100 shares of Yegen Bros., Inc., (a mercantile corporation at Billings), of the par value of $10 per share. On February 8th this stock was pledged by the Butte bank to the Anaconda bank, in which Yegen Bros. owned 85 per cent. of the stock, for a consideration of $20,000. The Anaconda bank had ample funds and the transaction was entered on the books of the Anaconda bank on February 9th. The entry on the Anaconda bank's journal read: "Union Bank & Trust Co. of Helena, R. (meaning remittance) Tfr. (meaning transferred) for Butte to Fed. Res. (meaning Federal Reserve)." The item of $20,000 appeared to the credit of the Union Bank & Trust Company in its general ledger as follows: "Feb. 9. Transferred to Federal Reserve in Butte, $20,000, credit to the Union Bank & Trust Company, Helena, Montana." The explanation given by the cashier of the Anaconda bank was that the Anaconda bank had money in the Union Bank & Trust Company in Helena, and wanted to use it; so they transferred the credit of the Anaconda bank to Yegen Bros., Bankers, Butte. He testified that the entries were correctly made under his supervision, and that

he understood at the time that the transfer was made that the $20,000 would be returned within two days, but that the stock pledged had not been redeemed up to the time he was giving his testimony; that he believed the transaction was had for the purpose of keeping the cash reserve at the Butte bank within the legal limit. The evidence is that the transfer was made as a pledge for the loan of $20,000, and that the transaction was without intent to hinder, delay, or defraud any creditor of the partnership, or of the individuals who made up the partnership.

The transactions with the Bank of the Republic of Chicago were as follows:

From and after 1922 Yegen Bros. at various times owed the Chicago bank large sums. The Chicago bank dealt with Yegen Bros., the partnership, and Yegen Bros., Bankers, and the individual Yegens, as one and the same. In 1922 the debt was over $157,000. In that year, for commercial facilities, Yegen Bros., of Butte, Bankers, partners and individuals, made a written trust arrangement, pledging to the Chicago bank, as collateral, commercial paper valued at over $95,000. At the same time Yegen Bros. of Billings also made a trust arrangement, pledging to the bank collateral securities of the value of over $64,000. The agreements provided that the collateral, or any substitute therefor, or any proceeds thereof, should be held by the trustees as collateral security for the benefit of the Chicago bank for all money due any time to that bank. The trustees were given the right to surrender to Yegen Bros., Bankers, listed collateral, but Yegen Bros., Bankers, were at once to deliver to the trustee, surrendering such collateral, other collateral equal in value, to be held by the trustees pursuant to the terms of the agreement. The trustees were never in any one week to surrender in excess of an aggregate of $25,000, face amount, of the collateral held by them, and, in exercising the right to substitute, the total value of all collateral held and to be held by the trustees should always amount at least to the face amount of the collateral set forth in the lists attached to the agreement.

The Chicago bank at all times was to have the right to require from Yegen Bros., Bankers, that there should be lodged with the Chicago bank, as security for all existing liabilities of Yegen Bros., and Yegen Bros., Bankers, to the bank, additional approved collateral securities to an amount "satisfactory" to the Chicago bank, and upon failure of Yegens at all times to keep a margin of securities for such liabilities of Yegen Bros. and Yegen Bros., Bankers, satisfactory to the

Chicago bank, or upon failure in business of the Yegen Bros., or Yegen Bros., Bankers, then all liabilities of Yegen Bros., to the Chicago bank, at the option of the bank, should become immediately due, notwithstanding any credit or time allowed by any instrument evidencing any of such liabilities. In the event of failure of the Yegens to pay the Chicago bank when any indebtedness to that bank should become due or upon failure to keep up the margin of collateral securities as provided for, then the bank could immediately proceed to sell any of the securities held by the trustees for the benefit of the Chicago bank as against any liabilities of Yegen Bros. It appeared also that, in addition to the sums covered, but independent thereof, the Yegens individually owed notes to the Chicago bank for $50,000. The notes, made in 1921, were secured by 850 shares of Anaconda bank stock, which was then valued at $165 per share.

In January, 1922, Yegen Bros. delivered to the Chicago bank a promissory note of George Arnott & Sons, Inc., for $48,000. By reductions and substitute notes this debt was at the time of the hearing evidenced by a note for $35,000, dated November 16, 1922, indorsed without recourse, to the Chicago bank, and was secured by 370 shares of the capital stock of a natural gas company, worth about $37,000, which had been pledged by the indorsers on the note, so that about February 1, 1924, there was due to the Chicago bank by Yegen Bros., Bankers, the Yegens as individuals, and the Arnott corporation more than $84,000. On February 2, 1924, the Chicago bank, claiming a right under the trust agreement, made demand upon the trustee at Butte, an officer in the Yegen Bros. bank, for collateral. The trustee, in response, transmitted to the Chicago bank collateral amounting to more than $45,000. The Yegens testified that this remittance was with the purpose of liquidating all debts owed by the Yegens as bankers and as individuals, and that they understood that upon the transfer of the collateral, stated by them to be worth $48,000, they would be entitled to a return of the Anaconda bank stock; that they had made demand for return thereof, but that so far as they knew the stock had not been returned. At the time of the hearing it appeared that there had been collections of more than $30,000 on the collateral that was transmitted to the Chicago bank.

We have not overlooked the suspicious circumstance that, when the trustee delivered the $45,000 collateral notes to the Chicago bank, the Butte bank charged the notes to the Billings bank, but that upon the Billings bank books there appeared no entry of the transaction. Yegen's explanation was that at that time the Yegens, individuals, had in the Billings bank a balance of $20,000 "to take care of some of these things," and that failure to enter the item at Billings was a matter of bookkeeping, and that "they hadn't got around to put it there." On the other hand, there is no showing that the trust agreement was made, or that any transaction had under its provisions was with fraudulent intent on the part of any party thereto, or to hinder or delay any creditor of the Yegens. The District Court must have accepted the Yegens' explanation as reasonable.

[1] We therefore take it that it was understood by the Yegens that the collateral delivered on February 2, together with the Arnott note, with its collateral, was reasonably sufficient to secure all debts due by the Yegens to the bank. This in effect made the transaction of February 2 a substitution of new collateral for the Anaconda bank stock, and was not more than a new form of security, and the Chicago bank became liable for the return of the Anaconda bank stock, the value of which was greatly in excess of the collateral delivered by the trustee. Cook v. Tullis, 18 Wall. (85 U. S.) 332, 21 L. Ed. 933; Clark v. Iselin, 21 Wall. (88 U. S.) 360, 22 L. Ed. 568; Sawyer v. Turpin, 91 U. S. 114, 23 L. Ed. 235; Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Chapman v. Hunt, 254 F. 768, 166 C. C. A. 214; Collier on Bankruptcy, p. 1283; Remington on Bankruptcy, § 1658. Under the circumstances, the fact that there was an omission to enter the item on the Billings bank books is not of vital importance.

[2] The payment of $20,000 to the treasurer of the city of Butte was made upon a check drawn February 8, 1924. The bank was then a going concern, and the treasurer had $35,000 on deposit.

We now turn to the transaction with the National Park Bank of New York. In December, 1923, or in the early part of January, 1924, Yegen Bros. had an arrangement with the National Park Bank of New York to discount $50,000 worth of commercial paper held by Yegen Bros. On January 31st Yegen Bros. mailed to the National Park Bank notes aggregating more than $50,000, and requested the bank to advance $50,000 to Yegen Bros. In anticipation of the allowance of the credit, Yegen Bros.' bank at Billings entered on their books a credit of $50,000. The item remained on the books until February 11th, when the notes were returned by the New

York bank, and on February 13th the item was credited to the National Park Bank. Yegen testified that the $50,000 item was used as a cash item in computing the reserve for the days it appeared as a credit. The general ledger of the Billings bank showed the transactions correctly. We do not see that this constituted a concealment or a fraud upon creditors.

It is argued that an act of bankruptcy was committed by reason of the attitude of Yegen Bros. in permitting two separate receiverships over the banks at Billings and Butte, respectively, in the state courts of Montana. The banks as separate organizations were declared to be insolvent within the meaning of the laws of the state of Montana. But in Yegen Bros., 1 F.(2d) 841, we held that the receivers were not appointed because of the insolvency of the owners of the banks, within the meaning of the federal Bankruptcy Act. The presumption, of course, is that in due course of administration the law will be followed in adjusting rights as between the several banks and their depositors and claimants against the funds.

[3] The foregoing disposition of the questions of fraudulent intent and unlawful preferences leaves for consideration the contention that the respondents must be held to have been insolvent, and that upon that issue the burden of proving solvency was upon the Yegens, because they appeared in court on the hearing without books, papers, and accounts. Section 3d, Bankruptcy Act 1898, amended Feb., 1903 (Comp. St. § 9587). The statute provides that, when a person against whom a petition is filed under the second and third subdivision of section 3 takes issue upon the allegations of insolvency, it shall be his duty to appear with his books and accounts and submit to examination, and give testimony as to solvency or insolvency, and in case of failure to do so then the burden of proving his solvency shall rest upon him.

Ordinarily there is little difficulty in applying the rule prescribed, but where the circumstances render the rigid application wholly unreasonable it should not obtain, and in the present case, since the Yegens testified to various items, and stated that pursuant to a duly made order of the state courts they had surrendered possession of their books and papers to the receivers, who still held them (at the time of the hearing), and that they themselves were without means to produce the books then in custody of the receivers at Billings and Gardiner, we think they furnished

12 F.(2d)—42

sufficient excuse for not obeying the statute, and that they were therefore relieved of assuming the burden of proof. Petitioners were not aggrieved, for the record is that they had access to and used the books of the Butte and Anaconda banks, and were offered access to the books at Billings and Gardiner; the judge stating that, if desired, he would appoint a special master to take testimony at the outside places. Petitioners, however, did not avail themselves of the offer.

[4] To set forth the assets and liabilities of Yegen Bros. as a partnership and as individuals would require the inclusion and analysis of lengthy statements, with a history of many particular items. It would needlessly extend the opinion. It is evident, however, that from 1921 on Yegen Bros. were heavy borrowers, with many properties, of which some had great value. About the time the banks closed, there was a notoriously widespread depression in property values in Montana. Upon the hearing of this matter the evidence showed radically differing opinions as to value. For example, a witness of experience gave $195,000 as the value of 17,000 acres of land belonging to a sheep company owned by the Yegens, which was $105,000 over the debts of the concern; whereas the receivers stated in effect that they had not been able to collect anything on the obligations of the company and were not certain they could realize on them. Again, in 1924 Arnott & Sons owed Yegen Bros. $123,000, but by May 7, 1925, they had reduced the debt to about $80,000. There was evidence that certain ranches were worth from $125,000 to $190,000, exclusive of live stock, while petitioners' evidence was that, with the incumbrances, the property was of insignificant value. Numerous other instances of differences in values might be given to show that the record sustains the District Court in deciding that petitioners did not prove insolvency as laid down by Bankruptcy Act, § 1, cl. 15.

Taking conceded liabilities at $2,346,711, and putting against them the assets as valued by petitioners, the excess liabilities were considerably more than $100,000. Taking the assets as valued by the respondents, there is an excess of assets of at least three times that sum. Careful study of the whole record impels the conclusion that the District Court was right in holding that the creditors failed to prove insolvency, or the commission of any act of bankruptcy.

The decree is affirmed.