## H. P. GOODMAN v. PAUL H. WANN, Admr.

Eastern Section. March 15, 1930.

Petition for Certiorari denied by Supreme Court, June 28, 1930.

C. C. Moore, of Chattanooga, for appellant.

Finlay & Campbell, of Chattanooga, for appellee.

PORTRUM, J.  A bill was filed in the chancery court to transfer and administer the insolvent estate of Nate M. Silverman, deceased, as provided by statute.  Silverman was a stock broker, with offices in Chattanooga and Gadsden, Alabama.  In the operation of his business, he became so involved with his customers, he committed suicide May 11, 1922.  Soon thereafter, two of his customers, R. H. Fitzgeral and T. W. Starkey each filed independent bills against his administrator to impound and fasten a lien upon certain funds that came into the hands of the administrator, on the theory that their funds went into the funds and they sought to segregate and identify their portions and have a decree therefor.

The administrator filed his insolvency bill and enjoined the prosecution of these two independent bills, along with all other actions, except in his cause, but it was provided that the two bills be made and treated as petitions filed in the cause.  Many other creditors filed petitions and sought recoveries.

The cause was put at issue, and proof was taken on the claims of Fitzgeral and Starkey, and the Chancellor heard and determined these issues before the cause was prepared for. a hearing generally— as to all others, the case stood at issue without proof and was not ready for a reference and report.

The Chancellor decreed that Fitzgeral and. Starkey were common and not secured creditors, and since this determined the controversy upon this issue so far as they were concerned, he granted an appeal.  However, this was an interlocutory decree, for it only fixed their status as creditors and served as directions to the clerk in reporting the secured and unsecured claims.  The costs were expressly reserved.  This method of procedure has led to difficulties in the determinations of the issues involved, because the asserted equities are dependent upon the status of certain of the other creditors and, since they were not given an opportunity to prepare their cases, the court cannot tell what their status is.  Had the appeal been denied until the clerk reported, this uncertainty would have been removed.  It is not good practice to allow appeals by piecemeal; if it is followed, an indefinite number of creditors may prosecute appeals before a report on the reference, whereas, if it had been delayed until after the report, there could be but one appeal.

Were it not for the statute permitting this court to remand a cause for further proof that justice may be done, we would hold the appeal premature and detrimental to the interest of general creditors and, therefore, an abuse of the discretion allowing appeals

from interlocutory decrees, that is, in the event we finally conclude the status of other creditors affects the equities of these appellants. We turn now to a consideration of these two claims.

Nate M. Silverman, a broker, dealt in securities and also in cotton and grain. He purchased securities outright for customers, or on margin account and, it is intimated, he bucket-shopped. The latter practice is where the broker undertakes to purchase securities on a margin account for a customer but makes no purchase on the stock exchange; he pays the increase in price, or pockets the loss himself, when ordered to close the account. When the security is purchased outright, the customer pays the market price plus commissions of the broker and receives the certificates. When he trades on a margin account, he advances to the broker a specified sum on each share purchased, say, ten dollars, plus broker's commission; if the market rises he profits to the extent of the increase; if it drops and his margin is about to be wiped out, he must put up more margin or the stock will be thrown on the market and sold by the broker, and the purchaser will have nothing.

The broker cannot go on the market and purchase a share of stock for ten dollars, i. e., the margin received. He has to purchase it outright and pay the market price. He holds the certificate as security for the amount advanced by him, with authority to sell the stock if it goes down and the margin is wiped out. In order to do this, the certificate must be taken in the name of the broker advancing the money. Otherwise, he could not dispose of the stock, and protect his security. The certificates are transferable by endorsement, and the broker can transfer it to his customer if he wants to buy it outright, or to another broker or purchaser if he wants to sell it by order of the customer or to protect his security.

In the purchase of cotton and grain, a contract was made for the commodity for future delivery, and a margin of from $3 to $25 per bale, etc. (according to the activity of the market), was required from the purchaser. The market fluctuated daily and the customer could sell his contract and take the loss or gain when he desired.

A brokerage requires a large amount of money to carry on an extensive business. It is borrowed from the banks in New York, and is known as "call loans." Silverman did not have available a large sum of money, nor could he borrow the necessary funds. In order to carry on his business he associated himself with a firm of brokers in New Orleans, by the name of H. & B. Beer, and this firm advanced the money and purchased the stock and commodities for Silverman, for a division of the brokerage commissions. But it was necessary that Silverman protect his associates, H. & B. Beer, against loss on his marginal account and, to accomplish this, Silverman opened two separate accounts with them, one a stock account and

the other gain or commodity. These accounts were made to protect the margins on all the transactions of Silverman. The funds were raised by Silverman from his customers to protect their individual accounts, but they were transmitted to Beer, as Silverman's funds to protect Beer against loss on Silverman's purchases.

If a customer was aware of this practice, he could isolate his funds in Silverman's account to protect his individual transactions. This was done through Beer by entering a subaccount in the name of the customer, which segregated his funds in Silverman's account. The purchases were then made by Silverman in the name of the purchaser and both accounts protected the margin.

When Silverman made a purchase of shares for a customer, he would use a direct wire from his offices to Beer's offices, and Beer would purchase the stock through their broker in New York, paying for the shares themselves, and taking the certificates in Silverman's name, but holding the shares as security for their purchase price. They were protected against a decline in the market by the account. If Silverman's purchaser bought the stock outright, Beer was directed to send the certificates, with a draft attached, to Silverman's bank in Chattanooga for payment and delivery to Silverman, who in turn endorsed and delivered them to the purchaser. When a purchaser who bought on a marginal account wanted to sell, he notified Silverman, who directed Beer to sell the stock which was held by them; and if the sale was made at an advance, Silverman drew on Beer for the amount of the profits which had been credited to Silverman's account with Beer. Transactions of this kind took place daily. Beer had no knowledge of whose securities Silverman purchased, except in case of the subaccount basis and Silverman had no subaccounts. Beer knew Silverman was trading as a broker.

On May 4, 1922, R. H. Fitzgeral gave Silverman an order to purchase for him outright twenty-five shares of Coca Cola stock at $56 per share. Silverman wired the order to Beer, with instructions to send stock to his bank, with draft attached. Before the order could be transmitted to New York and executed, the market closed and on the following day the order was executed at a reduced price—the market having declined one-half point—and the stock was purchased for $1392.50, including $5.00 broker's commission. On the 6th, Fitzgeral gave Silverman a check for the amount due, and received a confirmation of purchase, on a regular form, which entitled him to a delivery of the certificates and their endorsement by Silverman, in whose name they were purchased, upon their receipt by Silverman. On May 7th, H. & B. Beer charged Silverman's account with the purchase price of $1392.50. and before receiving the certificates from New York. They were delivered to Beer May 15, 1922, but in the meantime, on May 11th Silverman committed suicide. Beer was noti-

fied of Silverman's death and did not forward but held the Coca Cola certificates along with all others in Silverman's name until ordered by Silverman's administrator to close out the accounts by selling all the securities.

At this time, Silverman's stock account with Beer showed a deficit, but the true state of the account was not correctly reflected by the ledger entries for Beer held stocks of fluctuating values that could not be correctly charged and credited. Beer held in Silverman's name six hundred and seventy shares of stock in divers companies, including the twenty-five shares of Coca Cola stock. And in addition, there was a sale of 100 shares of Morland Short. When these shares were sold, the sum realized was sufficient to pay the indebtedness due Beer in the stock account of $16,770.62, with a balance in favor of Silverman of $4,252.80. This balance was paid to the administrator of Silverman, who held it in this suit.

' The contention of Fitzgeral in effect is that all these certificates in the hands of Beer at the date of Silverman's death, except the Coca Cola stock, belonged to Silverman. So, when the stock was purchased and paid for by Beer, the title vested in Fitzgeral, and Beer had no claim on the stock, for at the time Beer was indebted to Silverman in an amount larger than the price of the stock.

Appellant concedes the correctness of the following principles of law, based upon the facts, he states, to-wit:

"In this case there was no balance owing on the purchase price. Fitzgeral paid the full purchase price at the time. The title to the-stock vested in him, and there was no lien on that stock in favor of Silverman. If this stock had reached the hands of Silverman before he died, there could be no question as to the right of Fitzgeral to have his own stock delivered to him. But it had not reached Silverman's hands. It was in the mail, forwarded in regular course, at the time Silverman committed suicide. Does this deprive Fitzgeral of his stock? The Chancellor held that it did, on the theory that Silverman had not paid H. & B. Beer, and that H. & B. Beer had a lien on this stock against Silverman.

"If it were true that H. & B. Beer did not have in their hands at the time, any money or property belonging to Silverman, with which to pay for this stock, and they had advanced their own money on Silverman's order, to pay for it, it would necessarily follow that they had a lien for reimbursement. This would be true even though Fitzgeral had paid Silverman and he had converted the money to his own use. This result would grow out of the fact that brokers in dealing with each other for their respective customers, deal as principals. Campbell on Stock Brokers, page 29, states the rule:—

" 'The broker in transactions with other brokers, either dealing for his own account or for the account of a customer, has, as be-

tween him and the broker with whom he deals, all the rights and responsibilities of a principal dealing with a principal. Not only does this result from the rules of Exchange, which contemplates that its members shall deal with each other as principals, but it`is also in accordance with the principals of the law of agency, when applied to the facts of an ordinary transaction between brokers.'

"While the stock accounts on the books of H. & B. Beer showed a debit balance, the bookkeeper testifies that the stocks which they carried belonging to Silverman, at that time, was worth on the market, $4252.80 more than this debit balance.

"They charged the price of the Coca Cola stock against the value, the other stock which they had, leaving a balance of $4252.80 excess value to the credit of Silverman. This amount they paid over to the receiver in the cause, and is now held by the receiver subject to the order of this court.

"While it is true that H. & B. Beer had a right to sell these stocks belonging to Silverman to cover the debit balance, and account to Silverman only for this excess of $4252.80, it was not necessary that he sell this Coca Cola stock in order to be reimbursed. The Coca Cola stock when sold by him brought $1478.38. He could have taken his reimbursement out of the other stock belonging to Silverman in his hands, at that time, as he had more than enough to cover this reimbursement.

"When a customer purchases stock through a stock broker, the title to the stock vests in the purchaser at the time of the purchase, subject only to a lien for any part of the purchase price not paid at the time." Richardson v. Shaw, 209 U. S., 364, 52 L. Ed., 835; Skipp v. Stoddard, 21 L. R. A., 113; Stewart v. Brake, 46 N. Y., 449; Le Marchant v. Moore, 150 N. Y., 209.

The Chancellor applied this principle of law but said Beer, having paid for the stock, had a lien for the full price, and granted a preferred claim only for the profit of $89 realized when the stock was sold at the order of the administrator.

When Beer purchased the stock if they were indebted to Silverman individually in an amount equal to the purchase price, then no lien attached to the stock for the purchase price, no other equities intervening. If Beer had a lien on all the stock, including the Coca Cola stock, for an indebtedness, and a part of the stock belonging to Silverman individually, then Fitzgeral would be entitled to a marshalling of assets and Silverman's individual stock sold and· the proceeds first applied to discharge the lien.

This issue has settled to one question: Did Beer have any fund or stock belonging to Silverman individually that would be applied in exoneration of the lien on the Coca Cola stock solely? (If other creditors were in the same position as Fitzgeral, the funds of Sil-

566

verman would be pro-rated between them.) Fitzgeral insists he has established an indebtedness due Silverman individually from Beer, namely, the balance of $4,252.80. He has identified his stock and is, therefore, entitled to relief.

The mere fact that a broker's trading account of this character shows a balance in favor of the broker does not establish the ownership of the balance. As a matter of fact, the inference is the fund was composed of customers' margins, profits and perhaps some money belonging to Silverman. But if this be true, Fitzgeral says these customers cannot trace and identify their shares and the fund becomes Silverman's and they are only general creditors whose claims will be paid only after the payment of his claim. Assuming they cannot identify their stocks, still they may be able to show that the whole of the account arose from customers' stock transactions, and all of these customers are entitled to share in its distribution. It being made certain that a certain class contributed and created this "jackpot," it would not be equitable to allow one of the class to share in it to the exclusion of the others. In other words, Fitzgeral must show that the funds belonged to Silverman individually before he will be allowed to appropriate them to his claim. It is not equitable to take margins and profits of Silverman's customers and pay Fitzgeral's claim and thereby reduce the amounts these customers will receive as general creditors.

It is claimed that no other creditor can identify his stock, or show the balance was not Silverman's, and it was sufficient for Fitzgeral to show the balance. The creditors were not permitted to attempt to show it. Their petitions raising the question were just at issue when this question was determined on Fitzgeral's petition. The cause was not ready for a reference. This issue was determined prematurely, and the case will be remanded in order to allow the creditors to establish their status.

The allegation of the administrator and trustee that these creditors were general creditors does not raise an estoppel which eliminates proof of the status of the creditors. This is not an admission that the fund belonged to Silverman individually. This would not cure the prematurity, for a trustee cannot by his admissions estop one of a class of creditors against another.

But if Fitzgeral elects to stand upon the record as here made, the court is of the opinion he has failed to show any definite sum of money which belongs to Silverman individually and, under the facts of this case, he is not entitled to an application of the equitable doctrine of marshalling of assets. This may prove a hardship, for it may appear that Silverman owned the fund or a part of the fund in the hands of Beer. If on the remand it does so appear, he will be entitled to apply it to his debt. The record indicates Silverman

did have some funds with Beer that were not impressed with a trust, and Fitzgeral is entitled to share in this, either alone or with others having equal equities. This question will be discussed again.

If Beer, thinking they held a lien on the Coca Cola stock, paid over Silverman's funds, which may have discharged the lien, they did not jeopardize their rights so long as they had no notice of Fitzgeral's ownership of the stock; and he acquired thereby no superior right to marshall the assets. The ordinary course of business would indicate the payments were on transactions Silverman had closed for his customers. Under such circumstances, the burden was on Fitzgeral to negative this inference.

Starkey's case: T. W. Starkey lived at Scottsboro, Alabama, and had been dealing as an individual in cotton and grain through his local broker, Cooney & Company. This broker, like Silverman, was a correspondent of H. & B. Beer at New Orleans, and maintained a grain account with Beer. Starkey's funds were deposited in Cooney & Company's account, and segregated by a subaccount, in the name of Starkey. This was notice to Beer to use the subaccount to secure Starkey's transactions. Cooney & Company decided to go out of the brokerage business and this made it necessary to close up their accounts with Beer. At the time, Starkey had to his credit in the subaccount, $1011.48. He also had a purchase of 100 bales of May cotton at $17.05 and he desired to hold this contract. But he could not hold it if his broker went out of business. He discussed the question with one of the members of the firm, and he advised him to transfer his account to Silverman. He then sent this telegram to H. & B. Beer. "Please transfer my ledger balance and entire account to Silverman in Chattanooga and confirm."

Beer replied: "We are transferring one long May 1705 and ledger balance of $1011.48 from Cooney to Silverman account. See letter."

Silverman maintained no subaccount and the transfer was made without notice to Silverman and to his grain account. Nothing was said or done about the entry of a subaccount. Starkey sold his cotton through Silverman and made other purchases and sales making on the transactions $282.96. We think this profit was held by his broker in the nature of a trust and was not a common debt due from the broker to the customer. If it was not withdrawn it went into the grain account and should be decreed Starkey, out of the balance from the grain account.

A broker occupies a fiduciary relationship to his customer and is trustee of money coming into his hands as profits on his customers' transactions. Haight v. Haight, 190 N. Y., 540; Peoples v. Meadows, 199 N. Y., 1.

It might seem that this rule should be applied in reference to the ledger account. We think that a different matter and the purpose of the account was foreign to a fiduciary relationship. We do not think this was a trust fund. Starkey himself commingled his fund with Silverman's fund by directing that his account be transferred to Silverman's account. We think the transaction was in the nature of a loan in return for which Starkey was to receive, not interest, but Silverman's credit, and eventually the return of the sum loaned. It was not supposed or intended that Silverman would buy grain and cotton for Starkey, consuming the fund, and title in the commodities would rest in Starkey. Starkey intended to buy grain on a margin account and on the credit of Silverman. Beer understood this. Silverman's account with Beer was carried to protect Beer against Silverman's losses on the market.

Had Silverman's losses consumed his entire account, including the funds of Starkey, and had the account been applied to the losses, there would have been no breach of trust on the part of Silverman or Beer, for this was the very purpose for which the account was maintained. Starkey knew this, and put his funds in the account to increase Silverman's credit and permit more extensive transactions.

Under these facts, Starkey could not have followed his funds into the hands of Beer after their appropriation by Beer on the theory they were trust funds and Beer had knowledge of the trust since Starkey had directed Beer to make the transfer and Beer knew Starkey had funds in Silverman's account. Beer would have answered that that was the purpose actuating the transfer.

Had the losses consumed the account and Silverman not be guilty of a breach of trust in applying the account to his losses, then it is difficult to see how a part of the account could be a trust fund. We do not think it was a trust fund. Had the account been consumed by Silverman's losses, Starkey could not have followed the funds into the hands of Silverman's creditors, even if he could identify them, for Starkey placed the funds in the account as security for Silverman's creditors; then his only remedy would have been one against Silverman, and that, to recover a common debt and not a trust fund.

The fund was never impressed with a trust. The purpose of the transaction was the use of Silverman's name and credit, and Starkey was not denied either. There was no confidence imposed other than to carry out the agreement which is an incident to almost every commercial transaction. It was contemplated that at the termination of the arrangement, Silverman would repay Starkey the money advanced, and which had been used in the business; this created the relationship of debtor and creditor and not trustee and cestui que trust.

If Starkey's account of $1011.48 was not a trust fund, and the relationship between Silverman and Starkey as to it was that of debtor and creditor, then the $1011.48 must be treated as Silverman's money. Beer held these funds for Silverman and was Silverman's debtor. Beer may have applied this fund of Silverman's first in satisfaction of the lien against the Coca Cola stock belonging to Fitzgeral. . But since they did not do this but sold the stocks and paid both accounts into court, then the court may so marshall the assets. This court does not know how much· of the balance due Silverman from Beer of $4252.80 was derived from Silverman's grain account— the book balances from day to day will not show this—and until this is shown, it cannot be told how much remained of the $1011.48. There can be no marshalling against an indefinite sum.

And after the sum is determined, other creditors may appear with equal equities and be entitled to participate in the marshalling. This is an insolvency proceeding, as hereinbefore said, and every creditor ought to be given an opportunity to develop his equity before any of the assets are fastened on by another creditor. We are remanding this case to afford this opportunity. We have determined certain legal questions upon a supposed state of facts, and the creditors' rights will be determined when they bring their claims within the supposed facts.

The costs of appeal will be paid out of the funds of the estate. Modified, affirmed and remanded.

Snodgrass and Thompson, JJ., concur.