## Walter O. Salmon and Gertrude Salmon, Appellees, v. Henry Hornblower et al., Defendants. Paul B. Skinner, Appellant.

### Gen. No. 36,269.

Opinion filed February 6, 1933. Rehearing denied February 21, 1933.

Wilson & McIlvaine, for appellant.

Pines, Morse & Stein, for appellees; Alvin E. Stein, of counsel.

Mr. Justice Matchett delivered the opinion of the court.

Plaintiffs, Walter O. and Gertrude Salmon, husband and wife, sued in assumpsit. They filed a special count which alleged that defendants were stockbrokers; that plaintiffs delivered to them stock to be sold

at the price of $26 a share or more, which defendants failed to do, to the damage of plaintiffs. Later the common counts were added. Defendants pleaded the general issue. By stipulation a jury was waived. There was a trial by the court with a finding for plaintiffs in the sum of $1,248, upon which the court entered judgment.

At the beginning of the trial plaintiffs stated their theory to be that defendants were guilty of conversion of the stock; that plaintiffs waived the tort and were suing in assumpsit for the value of the stock. Propositions of fact and of law were submitted by defendants, all of which were refused.

There is little controversy as to the actual facts. The evidence for plaintiffs tended to show that on April 8, 1930, they were the owners of 48 shares of the common stock of a corporation known as H. O. Stone & Co.; that this stock stood in the name of plaintiffs as joint tenants with right of survivorship, and not as tenants in common.

On April 8, 1930, Mr. Salmon took the certificate of stock for the 48 shares to the office of defendants, who were partners in the brokerage firm of Hornblower & Weeks. He had been recommended to them by his friend, former Judge Asa G. Adams. Mr. Salmon had no account with defendants. During a conversation with one of the defendants' employees it developed that Mr. Salmon was an employee of H. O. Stone & Co. He was informed that the rules of Hornblower & Weeks forbade him to sell this stock in his name for that reason. Defendants' employee, however, suggested that the transaction might be carried out under the name of Judge Adams and after communicating by 'phone with Judge Adams, he giving his consent, it was agreed that the transaction should be carried through in his name.

Thereupon, by use of the 'phone, defendants verified the signature of Mrs. Salmon and defendants' cashier received the certificate for these shares of stock, giving to Mr. Salmon a receipt therefor as follows:
"Hornblower & Weeks
39 South LaSalle Street,

Chicago, Apr 8, 1930

"Received of Asa G. Adams Forty-eight (48) shs. H. O. Stone & Co. Common Stk.

HORNBLOWER & WEEKS
C. J. Dupre
Cashier.

"On all securities deposited with us as margin or collateral on account we reserve the right to transfer them to our possession on the transfer books of the Company."

While there is conflict in the evidence, defendants seem to concede for the purpose of this appeal that Mr. Salmon at that time directed the sale of the stock at 26 or better. An indorsement dated April 8, 1930, was placed on the back of the stock and over the signature of plaintiffs transferring the stock to Hornblower & Weeks and appointing A. Margolis, attorney, to transfer the stock on the books of the company with full power of substitution in the premises. There was also stamped on the certificate the following indorsement:

"We hereby certify that we have no ownership in ...... shares of the stock above transferred, the transfer to us by the owner being merely for the purpose of sale.

HORNBLOWER & WEEKS
39 So. LaSalle St.
Chicago."

It is uncontradicted that on the following day, April 9, the certificate for the stock was sent by defendants to the First Union Trust & Savings Bank for transfer

out of joint tenancy to the name of Hornblower & Weeks. On April 10, a new certificate was issued by the company in the name of Hornblower & Weeks, and on April 11, Mr. Salmon went to the office of Adams hoping to receive a check for the proceeds. The check had not arrived, and Adams telephoned the office of defendants. Defendants offered evidence tending to show that Judge Adams at that time ordered a sale of the stock at 26 or better. Adams denied that he gave such an order on April 11. However, apparently upon the theory that evidence had not been produced tending to show that Adams had authority to act for plaintiffs, the trial court struck out this evidence as well as further evidence offered by defendants tending to show that the order to sell was canceled by an order from Adams on April 16.

There is uncontradicted evidence in the record tending to show that when stock standing in the joint names of the owners with right of survivorship, etc., is taken for sale, it is necessary according to the custom of the stock exchange to have the same transferred out of the joint names in order to make a good delivery.

It was stipulated that the price of the stock per share was 26 or higher on April 8, 9, and 10; that on April 11, the high price was 24½; and further, that after April 11, 1930, the stock never reached the price of 26. This suit was filed by plaintiffs May 7, 1931.

Defendants requested the court to hold as facts that on April 11, 1930, the shares of stock were in the account of Asa G. Adams with defendants, and that Adams on that day gave an order to sell the stock at $26 per share or better which defendants accepted; that on the same day they sent a confirmation to Adams of the order; that on April 15, 1930, they again sent a confirmation to Asa G. Adams of the order of April 11 to sell at $26 per share or better; that on

April 16, 1930, Adams ordered defendants to cancel the order to sell, and that they canceled it on that date; that from April 11, 1930, when Adams ordered the stock sold, to April 16, when he canceled the order, the market price of the stock never reached the price of $26 a share. The court refused to hold any of these propositions and could not consistently so hold for the reason that the evidence admitted tending to show such facts had been stricken out.

Defendants also asked the court to hold as propositions of law that defendants did not on April 8, 1930, or at any other time, accept any order by plaintiffs to sell this stock; that the relationship of broker and client never existed between plaintiffs and defendants with reference to the sale of the same; that defendants did not at any time convert plaintiffs' stock to their own use; that plaintiffs accepted the receipt of defendants for said stock in favor of Adams and placed the stock in the account of Adams with defendants by and with the consent and approval of Adams; that Adams gave an order to defendants on April 11 to sell said stock at $26 a share or better, which order defendants accepted; that plaintiffs were bound as upon an account stated by the confirmation of the order of April 11, and were bound by the order of April 16, 1930, canceling the prior order of April 11; that defendants refused to act and did not act as the brokers of plaintiffs for the sale of the stock; that defendants acted as the agents and the brokers for Adams, and not plaintiffs. All these propositions of law were refused by the court. No evidence was introduced upon the trial tending to show that defendants were negligent in any respect or that they failed to exercise diligence, and it is not contended here that they are liable upon that ground.

Plaintiffs, however, contend earnestly that defendants by the transfer of this certificate of stock into

their own names were guilty of conversion, and they further contend, citing authorities, that they had the right to waive the tort and sue in assumpsit for the then value of their stock which the record indicates is now worthless.

Defendants, on the other hand, contend that the facts are not sufficient to show conversion. They say, citing Meyer on ''The Law of Stock Brokers and Stock Exchanges'' (1931), pp. 275, 317, that it is customary for brokers in their dealings with other brokers not to divulge the names of their principals but to make all purchases and sales in their own names; that this is the only method of trading ordinarily permitted on stock exchanges under exchange rules and is sanctioned by the law; that the broker may, if he wishes, carry his customer's securities in his own name, or in the name of his clerks. They cite as sustaining this view a number of cases, such as *Bailey v. Bensley,* 87 Ill. 556; *Banta v. City of Chicago,* 172 Ill. 204; *Leming v. Herring,* 162 Ark. 28, 257 S. W. 367; *Horton v. Morgan,* 19 N. Y. 170; *Cleminshaw v. Meehan,* 258 N. Y. S. 225; *McBride v. Chisholm,* 258 N. Y. S. 821; all of which state the general rule that a broker is not obligated to hold for or return to his client the precise certificate for shares of stock which was delivered to him, but that the return of a similar certificate for the same amount of shares is sufficient.

Plaintiffs, however, citing Meyer on ''The Law of Stock Brokers and Stock Exchanges,'' p. 317, argue that this general rule is applicable only to cases where the stockbroker is carrying the securities of his client on margin. They admit that in such cases the stockbroker is not required to retain the identical certificates, which he has received from or for his customer, but say that in other cases the identical certificates must be retained and returned on demand. They rely with other authorities on *Parsons v. Martin,* 77 Mass.

(11 Gray) 111; *Rumery v. Brooks,* 199 N. Y. S. 517.
There is language in the opinions in these cases which
would seem to sustain the contention of plaintiffs, but
an examination of the facts, as the same appear in
those cases, shows that they are inapplicable to this
record.

In *Parsons v. Martin, supra,* it appeared that the
stockbroker had not only placed the certificates in his
own name, but had actually sold and transferred the
stock to third persons and failed to pay over the pro-
ceeds to the plaintiff.

In *Rumery v. Brooks, supra,* it appeared that the
plaintiff and the defendant were both customers of the
same brokerage house which failed. Two years prior
to its failure the defendant purchased from this house
five United Kingdom of Great Britain and Ireland
5½ per cent notes of the par value of $1,000 each, and
left these notes in the possession of the brokerage
house. He was at the time carrying a stock account
with these brokers conducted on marginal operations.
From the time of the purchase of the notes until their
ultimate delivery he was occasionally indebted to the
brokers by reason of advances made for his account,
but for some time prior to the failure of the house he
was not indebted to it. Fourteen days before the fail-
ure the plaintiff opened a margin account and depos-
ited with the brokers three United Kingdom notes.
He apparently intended to do a marginal business
with the brokers and deposited the notes anticipating
that they would be used to protect the proposed ac-
count which he intended to open. He gave the brokers
the usual authority to pledge in case he became in-
debted to them, but he never in fact traded with them
and never became indebted to them from the time these
three notes were deposited until the brokerage house
failed. Up to that time the brokers retained in their
possession the identical notes which the plaintiff had

delivered to them. Four days before the brokers failed defendant requested the delivery of the five notes he had purchased. The brokers delivered five of these notes to the defendant, and of these five notes two were the identical notes the plaintiff had deposited with the brokers 10 days before. The court held that the title to the two notes had always been in the plaintiff; that his agreement with the broker to allow a repledge or sale or substitution was conditional on his trading and owing money, but that since he never owed or traded, the brokers were never authorized to sell or hypothecate; that if the notes had become part of collateral for marginal transactions, they would have become fungibles, whose identity was lost, but that as they had not become such, the plaintiff could recover.

The facts here are wholly different. In this case the certificate was delivered to defendant for the purpose of selling it for not less than a given price. The uncontradicted testimony shows that by the custom of the stock exchange it was necessary that the certificate should be transferred from joint tenancy in order that upon sale a good delivery might be made. We have no doubt that a broker, to whom a customer delivers a certificate showing his ownership of stock, with directions to keep the same safely in custody, and who accepts the custody upon those terms, would be required to keep and to deliver the identical certificates. The first duty of such broker is to comply strictly with the orders of his client, and the client has a right to give such directions as he may see fit. A different situation arises, however, where the owner and client after indorsement delivers the certificate to the broker with directions to sell. By such direction the customer would seem to authorize the doing of all things appropriate to the execution of the purpose for which the certificate was delivered. The stamp upon the certificate shows that the brokers by it witnessed to every

person by whom the certificate might be taken that they did not claim it as their own or appropriate it to their own use. There is not a scintilla of evidence in this record tending to show that these defendants attempted to use this certificate for their own benefit in any way or that it was put to any use which might be considered as unauthorized.

In *Cleminshaw v. Meehan*, 258 N. Y. S. 225, it appeared that the plaintiff left a certificate for 70 shares of Western Union Telegraph Co. stock with the defendants who were brokers. She indorsed the certificates in blank for the purpose of a sale at some future time when directed by her. She stated that she desired to place the stock near the market where quick delivery of same could be made, and the defendants (as they asserted) to insure immediate delivery in case of an order to sell, placed the certificate in street names shortly after they received it. The plaintiff gave no order to sell and afterward asked for the return of her certificate. The certificate was returned but not the same certificate which she delivered. The defendants had paid to the plaintiff the dividends declared on the stock while it was in their hands. She made complaint that the same certificate had not been redelivered and sued, demanding the difference between the value of the stock as quoted when the 70 shares were transferred to other names and its value when the 70-share certificate for the same stock was delivered to her. The New York court said that if the defendants had always kept in their possession or control the certificates received in exchange for the 70-share certificate delivered to them, there was no conversion, and that if the defendants pledged or disposed of the transferred certificates they would under the penal law of New York have been guilty of felony. The court said, however, that the parties evidently had in mind the holding that a stock certificate was not property; that ''a certificate

of shares in a corporation represents precisely the same kind and value of property as another certificate for a like number of shares in that corporation''; and cited *Caswell v. Putnam,* 120 N. Y. 153, 24 N. E. 287; *Richardson v. Shaw,* 209 U. S. 365, 14 Ann. Cas. 981. The court further said that under the authorities in order to constitute a conversion of the certificate of stock, two things were necessary: (1) property in the plaintiff with a right of possession, and (2) a conversion by the defendant of the thing to his own use. Judgment was rendered for the defendants.

It is not necessary to go so far in this case. It might well be questioned whether plaintiffs are entitled to these shares of stock since the receipt by agreement of the parties ran in the name of Adams; but however this may be, there is not a scintilla of evidence in this record tending to show that the property represented by this stock certificate was in any way appropriated to the use of these defendants. We hold that the facts do not constitute a conversion, and that defendants therefore as a matter of law are not liable.

The judgment is therefore reversed.

*Reversed.*

McSURELY, P. J., and O'CONNOR, J., concur.