KANSAS, OKLAHOMA AND GULF RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 93526, 93527. Promulgated November 1, 1940.

*William R. Spofford, Esq., Charles S. Jacobs, Esq.*, and *Robert S. Ingersoll, Jr., Esq.*, for the petitioner.
*Brooks Fullerton, Esq.*, for the respondent.

OPINION.

MURDOCK: The petitioner was organized under the laws of Oklahoma in 1919, to take over certain railroad properties pursuant to a plan of reorganization known as the "Hook Plan." All of the preferred and common stock of the petitioner was placed in trust pursuant to that plan and stock trust receipts were issued to the persons entitled to the stock. Those receipts were issued in bearer form. The properties of the petitioner were placed in receivership in 1924. A further plan for readjusting the capital structure of the petitioner was agreed upon in order to avoid foreclosure. The plan was put into effect in 1926. The Muskogee Co., hereinafter called Muskogee, had in the meanwhile acquired most of the series A, B, and C bonds of the petitioner, most of the stock trust receipts, and all of the common stock of the petitioner. The common stock was eliminated from the capital structure of the petitioner and most of the preferred stock held by Muskogee through stock trust receipts was also surrendered and canceled pursuant to the plan. Most of the bonds of the petitioner were exchanged pursuant to this plan for series A, B, and C preferred stock. Thus, at the conclusion of the 1926 readjustment, the only stock of the petitioner outstanding was divided into four different classes, namely, series A, series B, series C, and preferred stock, all of which had the same par value and all of which had the same voting privileges. Muskogee owned most of that stock.

The stock trust created under the "Hook Plan," which held only the nonseries preferred stock after the 1926 readjustment, was terminated on July 8, 1931. The surviving stock trustees sent a circular letter to all of the holders of the stock trust receipts in so far as their names and addresses were known to the trustees. The letter notified them of the termination of the trust and requested that the stock trust receipts be presented at once for exchange into certificates of preferred stock. Stock trust receipts were surrendered and certificates for 25,820 shares of preferred stock were issued prior to the close of 1931. Outstanding stock trust receipts for the remaining 1,180 shares of preferred stock were not surrendered by that time and a certificate for those 1,180 shares of preferred stock was issued to and registered in the name of "C. Jared Ingersoll, Agent" on December 28, 1931. The following table shows the amount of each kind of stock owned by Muskogee on January 1, 1932, and the total amount of that stock issued and outstanding on January 1, 1932:

| | Owned by Muskogee | Total stock issued |
|---|---|---|
| Series A preferred stock | $2,476,987.57 | $2,830,800 |
| Series B preferred stock | 234,257.84 | 280,400 |
| Series C preferred stock | 5,622,532.13 | 5,728,900 |
| Preferred stock | 2,561,400.00 | [1] 2,700,000 |

[1] This figure includes the 1,180 shares standing in the name of "C. Jared Ingersoll, Agent."

Stock trust receipts for 43 additional shares were presented during 1932 and the early part of 1933, so that the unclaimed shares were reduced to 1,137. There was no material change in stock ownership during the taxable years.

Ingersoll voted the stock in his name as agent on February 2, 1932. He gave no particular thought to the wisdom of voting the stock. The vote was not challenged and was not necessary to any of the business transacted at the meeting. The unclaimed shares were never voted thereafter.

All of the nonseries preferred stock, including unclaimed shares, was carried on the books of the petitioner as preferred stock until about March 10, 1933. The petitioner and Ingersoll decided at that time that it was improper for him to have a certificate for the unclaimed shares and he surrendered the certificate. Entries were made upon the books of the petitioner at that time, but as of December 31, 1932, reducing the preferred stock account by the amount of the par value of the unclaimed shares and crediting that amount to an account entitled "Stock liability for conversion—preferred stock."

Muskogee, which owns stock of a number of corporations engaged as common carriers by railroad, filed a consolidated return for itself and a number of those companies, including the petitioner, for each of the taxable years. The Commissioner, in determining the deficiencies, has eliminated the petitioner from that affiliated group and has computed its tax separately. He determined that Muskogee owned less than 95 per cent of the stock of the petitioner during the taxable years by including as stock, within the meaning of section 141 (d) of the Revenue Acts of 1932 and 1934,[1] not only the shares of preferred stock issued to persons who deposited their stock trust receipts and received certificates for preferred stock, but also the shares of preferred stock for which the holders of stock trust receipts had not as yet deposited those receipts. The Muskogee Co., by that method of computation, owned less than 95 percent of the stock of the petitioner during each of the taxable years. The petitioner contends that its stock, for the purpose of section 141 (d), includes only the shares of preferred stock issued to persons who had deposited their certificates of preferred stock, and does not include the shares of preferred stock to which the

---

[1](d) DEFINITION OF "AFFILIATED GROUP".—As used in this section an "affiliated group" means one or more chains of corporations connected through stock ownership with a common parent corporation if—

    (1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations ; and

    (2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations ;

     *      *      *      *      *      *      *

As used in this subsection the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.

holders of stock trust receipts who had not yet deposited them were entitled. Muskogee, by that method of computation, owned more than 95 percent of the petitioner's stock during each of the taxable years. Thus, the sole question for decision by the Board is whether or not the stock of the petitioner for the purpose of section 141 (d) includes the preferred shares belonging to persons who had not deposited their stock trust receipts. The decision of this question is important because the petitioner had a substantial amount of income for each year, whereas the affiliated group, exclusive of the petitioner, had a substantial net loss in each year.

There is no definition of the word stock in the Revenue Acts of 1932 and 1934 which is particularly helpful. Cf. section 1111 of the Revenue Act of 1932, section 801 of the Revenue Act of 1934, and the statement in section 141 (d) that "the term 'stock' does not include nonvoting stock which is limited and preferred as to dividends." There are a number of decided cases in which stock has been defined for the purpose of the question there involved, but their authority here is limited. The arbitrary amount of 95 percent in the definition of an affiliated group appeared for the first time in section 240 (c) of the Revenue Act of 1924. Congress used it to eliminate, as far as possible, the uncertainty which had existed under the "indefinite and vague language of existing law." Report of the Ways and Means Committee, 68th Cong., 1st sess., H. Rept. 179; Report of the Senate Finance Committee, 68th Cong., 1st sess., S. Rept. 398. The House bill contained the words "85 per centum", the Senate amended by increasing the percentage to 95, and the House receded. It was suggested in the discussion of this percentage in the Senate that it ought to be even higher than 95 percent. See Congressional Record, vol. 65, p. 7130. However, the percentage was fixed at 95 and has remained at that amount ever since, although the privilege of filing consolidated returns has been limited to railroads under the 1934 Act.

The parties are in dispute only as to what stock is to be included in the 100 percent from which the 95 percent is to be measured. It may be conceded for present purposes that stock owned by the issuing corporation itself, such as, for example, treasury stock, would not have to be included in the 100 percent. Cf. *Borg* v. *International Silver Co.*, 11 Fed. (2d) 147; Fletcher Cyclopedia of Corporations, vol. 11, § § 5083, 5088. But all stock owned by others than the issuing corporation would certainly have to be included in the 100 percent (excepting, of course, the nonvoting limited and preferred dividends stock mentioned in section 141 (d), which will be disregarded for the present discussion).

Muskogee owned most of each of the four classes of preferred stock of the petitioner during the taxable years. Others owned and

held certificates for a portion of each class of that stock. The parties are in agreement as to all such stock. They differ as to whether there should be included in the 100 percent the shares of preferred stock, somewhat in excess of 1,100, for which stock trust receipts had been issued to persons, not otherwise identified in this record, who had never surrendered those stock trust receipts for certificates of preferred stock of the petitioner. Those persons were entitled to receive certificates for shares of the preferred stock of the petitioner upon surrender of their stock trust receipts. Furthermore, a certificate is only paper evidence of the ownership of a share of stock and those persons were the real and beneficial owners of that portion of the petitioner corporation measured by the eleven hundred and some shares of stock, even though they had failed to exchange their stock trust receipts for certificates. *Black Eagle Mining Co.*, 94 Okla. 199; 221 Pac. 425; Fletcher Cyclopedia of Corporations, vol. 11, § 5092; *Richardson* v. *Shaw*, 209 U. S. 365; *Pacific National Bank* v. *Eaton*, 141 U. S. 227; *Anita Owens Hoffer*, 24 B. T. A. 22; *Elvira Scatena*, 32 B. T. A. 675; affd., 85 Fed. (2d) 729; *Mascot Stove Co.*, 40 B. T. A. 1057, 1065. "A share of stock in a corporation consists of a set of rights and duties between the corporation and the owner of the share." *Winslow* v. *Fletcher*, 53 Conn. 390; 4 Atl. 250. Those rights and duties existed as to the shares here in question. The owners of those shares were the owners of that proportionate interest in the petitioner just the same as Muskogee and the other holders of certificates were the owners of the proportionate share in the petitioner represented by the number of shares belonging to them. All of this particular class of preferred stock of the petitioner was included in the trust under the "Hook Plan" and, obviously, all of that stock was outstanding as stock of the petitioner until the termination of the "Hook Plan" in 1931. If at some time thereafter it ceased to be stock of the petitioner, as the petitioner contends, just when did that occur? Surely some proceeding aside from the mere bookkeeping entries made by the petitioner in March 1933 would be necessary to retire and cancel it. The petitioner had some reason to believe that the owners of the small interest here involved might never appear and claim their property. Perhaps their interests might have been forfeited and canceled by a court proceeding, but they never have been. Those interests during the taxable years belonged to and were owned by someone other than the petitioner, and that proportionate ownership in the petitioner can not be ignored for the purposes of section 141 (d). Therefore, we conclude that the petitioner was not affiliated with Muskogee.

*Decision will be entered under Rule 50.*